ATTORNEY FOR APPELLANT
Amber L. Lapaich
Michigan City, Indiana

ATTORNEY FOR APPELLEE
Douglas L. Biege
LaPorte, Indiana



# In the
# Indiana Supreme Court

### No. 46S04-0907-CV-00346

GINA JOHNSON,

*Appellant (Respondent below),*

v.

ROBERT JOHNSON,

*Appellee (Petitioner below).*

Appeal from the LaPorte Superior Court No. 1, No. 46D01-0604-DR-119
The Honorable Kathleen G. Lang, Judge
The Honorable Greta S. Friedman, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 46A04-0810-CV-00570

**January 28, 2010**

**Shepard, Chief Justice.**

In the course of settling their dissolution, Robert Johnson agreed to pay Gina Johnson for her interest in the family farm. When Robert later sought to renew a line of credit and restructure the farm's debt to pay Gina, the bank required Gina's agreement to give the bank's lien priority over hers. After she refused, Robert sought a declaratory order subordinating her lien. The trial court granted his motion.

We conclude that the parties' settlement agreement, though silent on the subject, must have contemplated the regular annual renewal of the farm's debt to finance its operations but not the higher level of debt necessary to finance Robert's obligations to Gina. Thus, the trial court's order impermissibly modified the settlement agreement. We reverse.

**Facts and Procedural History**

Since roughly the time Robert and Gina Johnson married, Robert has farmed with his father. About 1992, the two entered a partnership to operate Sunset Dairy, Inc., a dairy and grain farm.[1] From the beginning of the partnership, the farm has used a series of lines of credit to finance its operations. Each April 15 the farm takes out a loan at First Source Bank to finance seasonal expenses such as fuel, chemicals, and rents.[2] After selling the fall harvest, the farm repays the loan. The line of credit is secured by an all-assets security agreement that is cross-collateralized with all other collateral with the bank as well as personal guarantees from the farm's owners. The bank requires first position on all assets securing the farm's debt.

Although Robert farms with his father, Gina has always had at least a minimal role in the family business. She was well aware of the farm's annual financing arrangement. Robert testified that he and Gina talked about the financing, that Gina was present when he bought the first two hundred acres of land, that she signed her name to the note, and that she knew the amount of money Robert financed each year. (App. at 29–30.)

Gina and Robert divorced in May 2007 after fifteen years of marriage. The parties negotiated a settlement agreement covering child custody and support, as well as a division of property. As for property, it called for Robert to receive all the real estate the parties jointly

---

[1] The parties do not outline the distinctions between Robert and the farm.
[2] There are also equipment loans, with security agreements. (App. at 24–25.)

2

held, including the farm, which the agreement characterized as jointly owned by Robert and Gina. (App. at 67.) Robert also received various federal and municipal bonds. Gina received certain identified personal property, and Robert received all the personal property remaining at the marital residence. The Johnsons' settlement agreement provided that Robert would pay Gina a total of $900,000—about $1 million when interest is included—in several phases.[3] (App. at 68–69, 101–03.) It provided that all payments would be completed by the beginning of 2013. Before entering into the settlement agreement, Robert spoke with First Source to discuss payoffs to Gina.

The trial court approved the agreement and entered the dissolution decree on May 7, 2007. Robert made all required payments until April 2008, including $300,000 paid during 2007 and about $11,600 in monthly payments during early 2008.

In April 2008, when Robert sought to renew his line of credit for the first time since the divorce, First Source required him to obtain an agreement from Gina ensuring her interests in the farm would not subordinate its own.[4] (App. at 6.) Gina refused to sign the agreement, so Robert petitioned the trial court to subordinate her judgment lien, appoint a commissioner to execute a subordination agreement, or suspend payments until he could attain adequate funds to pay. Gina opposed the motion, asserting that the trial court did not have the authority to subordinate her interests because to do so would require it to modify the property settlement agreement that had already been approved and incorporated into the dissolution decree. (App. at 7.)

---

[3] Robert agreed to pay Gina $20,000 at the time of the agreement, $80,000 a month later, and $5,000 each month until the end of 2007 with an additional $170,000 lump sum due at that time. This totalled $300,000 in the first six months interest free. (App. at 68–69.) Beginning in February 2008, Robert agreed to pay an additional $600,000 on an amortized schedule at six percent over five years, totaling almost $700,000 including interest. (App. at 69, 103.)

[4] By the time the trial court entered the dissolution decree in May 2007, the bank's lien against the farm for the 2007 line of credit was already entered. (App. at 25.) The record before us does not include any proposed agreement or any other similar evidence. Nevertheless, it is clear that Robert intends to secure the financing he intends to use to pay Gina with a first-position lien. (App. at 6–7.)

After hearing testimony by Robert and a First Source assistant vice president as well as arguments from counsel, the trial court granted Robert's motion and ordered the parties to "do all that is necessary" to allow Robert "to refinance the line of credit" including subordinating Gina's existing lien "so that she may ultimately get paid the money she is owed." (App. at 9, 18–45.) The Court of Appeals affirmed. Johnson v. Johnson, 902 N.E.2d 830, 834–36 (Ind. Ct. App. 2009). We granted transfer.

**Standard of Review**

Declaratory orders have the force and effect of a final judgment or decree. Ind. Code § 34-14-1-1 (2008). As such, we treat them in the same manner as other judgments. Findings of fact are reviewed under a clearly erroneous standard, and conclusions of law are reviewed de novo. Ind. Trial Rule 52(A). Interpretation of a settlement agreement, as with any contract, generally presents a question of law. Bailey v. Mann, 895 N.E.2d 1215 (Ind. 2008).

### I. Just How Subordinate Is Gina's Lien?

Under the common law, priority in time gives a lien priority in right. Jones v. Rhoads, 74 Ind. 510 (1881). A lien is discharged when the debt or obligation which it secures is paid. East v. Ferguson, 59 Ind. 169 (1877). Generally, when a lien with first priority is discharged, the second lien takes its place in priority, and subsequent liens would be junior to it. An individual may waive a lien's priority by agreement. Pittman v. Max H. Smith Farms, Inc., 506 N.E.2d 1139 (Ind. Ct. App. 1987).

Both parties agree that the settlement agreement and decree created a judgment lien under Ind. Code § 34-55-9-2. (Appellant's Br. at 6–7; Appellee's Br. at 7.) See Franklin Bank and Trust Co. v. Reed, 508 N.E.2d 1256 (Ind. 1987) (judgment lien statute applies automatically where one spouse is ordered to pay the other money in installments; dissolution statute requires a

court's positive action to alter the lien statute's application).  They also agree that the bank's lien securing the 2007 line of credit had priority over Gina's judgment lien because it was first in priority on the date of their settlement agreement.  Their disagreement arises with lines of credit entered subsequent to the date of Gina's judgment lien.  Gina argues that she agreed to waive her priority only up to the amount taken out for the farm's operations in the past.  Robert asserts that it waives her priority without limit.  This leads to the question, what is the nature of her lien?

An agreement for division of property is economic in nature—an ordinary contract.  Marriage of Snow v. England, 862 N.E.2d 664 (Ind. 2007).  Courts therefore interpret the settlement agreements using ordinary contract principles.  Bailey, 895 N.E.2d at 1217.  Thus, the goal of courts in interpreting a settlement agreement is to ascertain and give effect to the parties' intent.  See Reuille v. E.E. Brandenberger Const., Inc., 888 N.E.2d 770 (Ind. 2008).  Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations.  First Federal Sav. Bank v. Key Markets, Inc., 559 N.E.2d 600 (Ind. 1990).  When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the fact-finder.  Noblesville Redevelopment Comm'n v. Noblesville Assocs. Ltd. P'ship, 674 N.E.2d 558 (Ind. 1996).  Hindsight tells us that the parties could have negotiated terms to resolve the present dispute, but they did not.  Thus, the courts are left to divine their likely intent.

The agreement undeniably assumes the farm's continued operation.  It grants Robert the entire farm assets and pays Gina for her interest in the family business rather than taking an approach that assumes the end of the farm's existence, such as splitting the proceeds from its sale.  The farm's continued operation, at least in the manner Gina had grown accustomed, requires renewing the lines of credit at issue here.  As such, by virtue of Gina's knowledge and the agreement's silence, we conclude that Gina necessarily agreed that a bank lien securing the ordinary, continuing business operations following the pattern to which she had grown accustomed would maintain priority over her judgment lien.  Financing that follows this established pattern should be construed as included in the agreement as necessary to giving effect to the parties' reasonable expectations.

5

Robert moved for the court to grant him the ability <u>both</u> to continue the farm's financing and to borrow enough to pay Gina for her interest in the farm. (App. at 105–06.) He asserted that Gina had full knowledge of the financing required to run the farm and "that it would be likely" that he would need additional financing to make his payments to her. (<u>Id.</u>)

Unlike the annual lines of credit which Gina impliedly agreed to allow to continue, the funds for Robert to pay Gina are not implied as necessary to the agreement. While Gina's knowledge that the farm's continuing operation depended on renewing financing meant that she impliedly agreed to a subordinate position, it does not suggest that she would have assented to Robert taking on unstated amounts of debt as he might choose from time to time to finance his payments to her. Such an arrangement would offer her little protection in case Robert defaults again.

Robert's counsel argues that any limitation the trial court might impose on the amount of the line of credit would constitute an impermissible modification of the settlement agreement. (Oral Argument.) While the agreement does not include any explicit limitation, the amount of annual debt it implies certainly has some ceiling, defined by what Gina would recognize as the <u>status quo</u> established by the time of the Johnsons' divorce. Gina already impliedly agreed to subordinate her lien to the bank's in an amount sufficient to continue the <u>status quo</u> as respects operation of the farm, but not to finance the divorce. An order declaring Gina's judgment lien subordinate to the lien securing the annual line of credit would not constitute a modification but an enforcement because it implies the continued financing of the farm's operations. Conversely, an order subordinating her lien to the bank's for amounts over and above such an amount would constitute an impermissible modification.

The Court of Appeals noted that "the taking of a new note and mortgage for the same debt upon the same land will not discharge the lien of the first mortgage unless the parties so intended." <u>Johnson</u>, 902 N.E.2d at 835 n.1 (quoting <u>Rebel v. Nat'l City Bank of Evansville</u>, 598 N.E.2d 1108, 1110 (Ind. Ct. App. 1992)). It went on to state that if the farm's debt "was merely being renewed," First Source's lien would retain its superiority. <u>Id.</u> Although the Court of

Appeals left that determination for the trial court, it is clear to us that the customary lien secured debt for seasonal agricultural expenses. Rather than "merely being renewed," the farm takes out new debt for the same purposes under nearly identical terms every April 15. Because the "rents, fuel, chemicals," etc., that the line of credit goes to finance are not identical to those financed the previous year, the bank's priority would become subordinate to liens entered in the interim. It is Gina's implied agreement to allow the farm to continue its operations, not the allegedly automatic renewal of the liens, that subordinates her lien to the bank's.

## II.       Was The Trial Court's Order an Impermissible Modification?

The trial court concluded that the settlement agreement created a general judgment lien, that subordinating Gina's lien would be a modification of the divorce decree, and that a fair and equitable result required such modification because failure to do so would jeopardize all parties' interests. (App. at 9.)

The court concluded that it could modify a general judgment lien created when a dissolution settlement agreement was entered. It stated that courts "are entitled to broad discretion when it comes to a modification of a court order," citing McCormick v. McCormick, 780 N.E.2d 1220 (Ind. Ct. App. 2003). (App. at 8.) McCormick involved a former husband seeking to revoke his spousal maintenance, not the modification of property disposition or lien priority. Id. But of course, modifications of spousal maintenance are expressly permitted by Ind. Code § 31-15-7-3 (2008).

We thus turn to whether the trial court had the authority to modify Gina's lien to allow Robert to finance his divorce obligations. Unlike spousal maintenance, property distribution settlements approved as part of a dissolution may be modified only where both parties consent or where there is fraud, undue influence, or duress, none of which is alleged here. Ind. Code § 31-15-2-17(c) (disposition of property settled by agreement may not be modified by court); Ind. Code § 31-15-7-9.1 ("orders concerning property disposition . . . may not be revoked or

7

modified, except in case of fraud."); <u>England</u>, 862 N.E.2d at 668 ("As with other contracts, a division of property may only be modified according to the terms of the agreement, if the parties' consent, or if fraud or duress occurs."); <u>Myers v. Myers</u>, 560 N.E.2d 39, 42 (Ind. 1990) ("A property settlement agreement incorporated into a final dissolution decree and order may not be modified unless the agreement so provides or the parties subsequently consent.").

We have already determined that subordinating Gina's lien up to an amount necessary to maintain the farm's operation is not a modification but an enforcement. Once having approved the parties' settlement agreement and incorporated it in the device, a court directive compelling Gina to do more than that by subordinating her lien to allow Robert to finance his divorce obligations constituted a modification and was impermissible.

**Conclusion**

We reverse the judgment of the trial court.

If Robert's declarations about the state of his finances are accurate, he may well be unable to pay Gina without financing higher level of debt on the farm. It is probably in both parties' interests to negotiate an agreement allowing Robert to meet his obligations. Numerous arrangements that meet both parties' needs exist, and we encourage them to avoid further litigation on this issue.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.